Good morning, ladies and gentlemen. Our case for argument is First American Bank v. Federal Reserve Bank. Mr. Wilson. Thank you, Your Honor. May it please the Court, good afternoon. Imaging checks makes great sense in the modern age. It's cheaper for banks to send images for payment compared to the way it worked in the past with the sending of originals. Imaging, however, presents a risk previously unknown to the common law of commercial paper. For hundreds of years, both the holder and the payor of an instrument had the opportunity to review a physical instrument for irregularities. No more. Now the depository bank personnel, the personnel at the depository bank, they're the last experts to be able to review the physical item before it gets the image destroyed and sent out for payment. So if the image is bad, the payor does not have the same opportunity to inspect the instrument for signs of counterfeiting as it used to have in the days of paper instruments. The system, this electronic presentment system, will only work if the law requires the depository bank to stand behind the quality of its imaging. The depository bank, not the payor bank, is closest to the facts, the only one that sees the instrument, the original instrument. So you're the payor bank, right? That's right. Couldn't you have requested a substitute check? Theoretically, we could have. Well, why do you say theoretically? Because there was no reason to do that. There was nothing suspicious? With this instrument, as we received it, the electronic item, it was not suspicious. There was nothing about it that's suspicious at all? Well, what we know from the electronic item was that... That's capable of a yes or no answer, though. The answer is no. No. There was nothing suspicious. Nothing suspicious. That triggered suspicious to the people at our bank that reviewed it. Well, that's a different... It could be not suspicious to them, it could be suspicious to a reasonable person. So you had the electronic thing, but my impression was the electronic image, whatever, did contain suspicious elements, which should have triggered a demand for a substitute check, which has to be absolutely perfect. If an electronic item is suspicious, the payer bank can bounce the check or bounce the electronic item. Just not honor it. Just not honor it, right. And the bank, Citizens Bank, argues in its brief that there were some things on the check itself that were suspicious, but those all go to the check stock and the idea that one had to compare the image of the check stock that we received as compared to the check stock on checks that First Aid Corporation used for other transactions. We're talking about the $486,000 check? Yes. And the problem with that argument is that it assumes that check stock is always the same, even for individual customers. That's not true. Especially commercial customers routinely use different check stock for different accounts, for different books of account, even with one bank account. I know my law firm, we have multiple kinds of checks for different things. And that is not something that a back office personnel at a bank would look for, because there's no way to evaluate that this particular image. But if you have the slightest doubt, you can request a substitute check, which you can rely on. It's true. One could have requested a substitute check or bounced the check if there was something that triggered that in the mind of the personnel. Is it normal banking practice, by the way, to destroy the original document? I think it's fair to say, and this is me speaking now, but I think it's fair to say that that's very common today. I know little or nothing about the banking business, but it strikes me as being odd that you destroy the original document. They destroy the original document. Well, you know, that's a choice that the banks make, and it's permitted by the Federal Reserve Regulations, Check 21 Act, and it's a choice. And it can be a very good business choice, because it's cheaper, after all, to send files of images as opposed to sending original checks. But with that choice comes consequences, and the Federal Reserve Regulations set up a scheme so that if you make that choice, you have responsibility for the rare, admittedly rare, situation where it goes awry. And that's all we're saying here. We're saying that in this case, the image was bad. If you look at the security box on the back of that check, it is illegible. It's gibberish. And in those security boxes, which are on check stock, it's very common. This check you received, or what? What is this check that's unintelligible? It is. It's unintelligible. Something you received? Yes. Your client received? Yes. The image that we received electronically was unintelligible. Well, why wouldn't that trigger a request for a substitute check? Well, there's no obligation. I know, but if you're getting a check which is unintelligible, don't you want to get the clean version of it? Otherwise, how do you know what to do with it? Your Honor, it seems to me that if that is going to be a requirement, that's something that it should be required by a contract or by a regulation or a statute. Could they have done so? Sure. But in the vast majority of cases, there is not a problem. Check clause? Yes, but if you get a check and it looks problematic and it looks screwed up in some way, then you'd think self-protection would say, well, I demand a substitute check, which has to be absolutely clean. It sounds like the simplest thing in the world. Frankly, Your Honor, there are other issues with that as well. We have the midnight deadline. We have the modified midnight deadline in the regulations. The bank has to act swiftly. That's what writes the suit. Yeah, well, that's a good idea, acting swiftly. What is this, some tiny little bank? It doesn't have enough resources to be able to act quickly when it gets a funny-looking check? Is that what you're saying? What we received was- How big is this bank, First American Bank? I don't have a quick answer to that, Your Honor. It's a leading regional bank. But the important point, I believe, is that when the check image came in, we had what we had. It was in a batch file of all other items being presented that day. And if all the banks that had their images compiled into the file and sent off to First American Bank, if all those other banks are the ones that did the imaging, and if they created a bad image, that's on them. It's not on us. We don't have a- There was a citation in- that we're talking about cleared at all? Well, our bank was the payer bank, so the clearing of the check was when we paid it. Yeah, you paid it. Yeah, so we did pay the check. There was no checking to see whether the money had legitimately been deposited. Well, that is- Money was supported. Your Honor, that is an issue. That's a problem for Citizens Bank, not my bank. Yeah, yeah. Because Citizens Bank- I'm correcting my analysis. That's what we understand the facts to be. I didn't suggest it was your fault. And I appreciate that. All the regulation at issue here says is that the depository bank warrants that the image accurately represents all of the information on the front and the back of the original item. That's what it says. All of the information on the front and the back. We have clearly alleged- This was a 12B6 dismissal. We clearly have alleged that the security box on the back was a bad image. We copied it and put it into the pleading. It's in the brief. It's gibberish. You can't read it. I don't understand how you can think that you can rely on an image which you know to be bad as still representing an authentic check. Because under the whole scheme, Your Honor, it's the risk falls on the presenting bank. It doesn't fall on us. They gave us a warranty. Where is this? Where is this? The regulation, 12 CFR 210.6B31A. No, I don't care about that. What does it say? The regulation. The text of the regulation is that the presenting bank warrants that the image, and I'll get you the wording, accurately captures, quote, all of the information on the front and the back of the original item. All of the information, front and back. We have alleged that the information on the back was not accurate. There's not an accurate image of the information on the back. But you don't propose to do anything about it. You've noticed a mistake. It doesn't occur to you. You could speak to the bank that it sent it to you and tell them that we'd like you to redo it. You could have done that, or you could have simply asked for a substitute check from them. Then that would eliminate all the confusion. Well, it's not a fact that we saw it as being suspicious. Did you know there was something wrong with the check? So you wouldn't notify anybody because you didn't believe there was anything wrong? We paid the check. That's what I can say. That's what's in the pleading. No, no, you just said that it was obvious that the check that had been received was screwed up. Now you're saying the bank didn't know it? Doesn't look at these things at all? When the back office bank personnel looks at the back of a check, they look to see what's there and do what they can with the information that's there. If the image is bad and they can't do anything with that information because it's bad information, it's unreadable information, then they just have to go on with their work that day and process the check. Go on with their work. Don't they tell their superiors, we've received an unintelligible check and what are we supposed to do with it? Your Honor, all of that's possible. The answer to that question is that could certainly happen, and this is all the sort of information that would come up in the factual development of the case. Who handled this check in the back office of First American? What did they do? Why did they do it? Who handled the check at Citizens Bank? What did they do and why did they do it? That's all information that's going to come out. But as a legal matter, what the element of our claim is, it's a claim for breach of warranty under that Regulation J, and all the elements, if you will, of our claim are that we have to allege that we received presentment of an image as opposed to an original, that information on either the front or the back was a bad image, and that the bad imaging caused us some damage. And that's what we said. What appears on the back of the check? Well, lots of things. Typically. Yeah, lots of things appear on the back of the check. I mean, certainly you have endorsements. You have account numbers sometimes. But germane to this case, you have that security box. And what's in that security box, it's in light coding. And you can look at your own checks. You'll see it. It's in light ink, but it is legible in a good image. And what it will describe, it has a description of the security features of that check. And the back office personnel at the payor bank can read what's in that text box. It's a code that tells them that. Well, it's not a code. It's just in words and text. And it will say things like, this check has a padlock, or this check has this or that other security feature. And the person at the depository bank, when it gets a check over the counter, can read to see what's supposed to be on this check and see if it is there. And if those security features that are described in the box survive the imaging process, then the person at the payor bank can do the same thing. But we didn't even know what was supposed to be on the check. Do checks come from manufacturers, just a small number of manufacturers? I don't believe it's a small number. There's lots of manufacturers, and there's no requirement, at least at our bank, that a customer use our check stock or anything like that. You can go to Costco and buy check stock if you want. And the important point here is, for this Regulation J claim, we didn't know what we were supposed to check. If they hadn't had anything but the endorsement on the back of the check, say from John Doe, would you have taken the check, typically? If it did not have an endorsement? No, it had an endorsement, but nothing else. To be fair, Your Honor, I'd have to ask the bank what its policies and procedures are to answer that question. But that's what we don't know. If something's been altered or not altered, it may not even have to be there, right? Well, if what's required when, as you say, somebody in the back office looks at the back of the check, what are they looking for, what's required that they look at? Yeah, so that by and large comes down to each bank can develop their own policies and procedures. They have a certain general regulatory requirements. They have safe and sound procedures. But I can say that I believe that banks in my bank situation typically review the front and the back of the checks, especially for large dollar amount checks like this. There are going to be cutoffs for dollar amounts, but for large checks those should kick out of the system and they should be looked at. And whatever information we receive in the image, we're going to use that information to go through a process to see whether it's a check that should be paid or a check that should be balanced. And that's what we did. The arguments on the other side about Regulation J I think are run completely contrary to the purpose of the rule. The purpose of the Reg J warranty, as set forth by the Federal Reserve Board, is to facilitate and encourage electronic check processing. But if this rule from the district court is to stand, then you're going to encourage banks, just as Judge Posner was suggesting. Why do you think they created this concept of a substitute check? It must have been because they thought that this electronic stuff, you know, you'd get messed up images and what have you, and therefore to protect the recipient of a garbled check, you would empower it to request a substitute check, which would have to be, as a matter of law, would have to be perfect. Why'd they do that? You think it's totally irrelevant. The recipient bank, it doesn't matter what's scribbled on the back. Well, first of all, the substitute check does not have to be... Scribbled on the back, this is a joke. You wouldn't care about that, right? Well, it might. No, I mean, you have this image of some dumbbell in the back office who just, you know, doesn't read any of this stuff, or if he or she does read it, doesn't think it has any significance. Well, that could happen, but the issue under the warranty provisions of Reg J are about the imaging. That's what this is about. Well, it's none of my business. You're in your rebuttal time. Thank you, Your Honor. And I'll close with one answer to the first part of Judge Posner's last question. The reason substitute checks were created was because before Check 21, banks could refuse to accept images, and so by statute and regulation, the courts, the banks had to accept substitute checks. These days, they aren't used very much anymore. Thank you. I'll reserve the rest of my time. Okay, well, thank you, Mr. Wilson. Ms. Collado. May it please the Court, my name is Victoria Collado, and I represent Defendant Citizens Bank and Federal Reserve Bank of Atlanta. The District Court's dismissal of the Second Amendment complaint should be affirmed, and the result here is consistent with the rule in Price v. Neal and banking law for over 200 years where there's two innocent victims of fraud. The depository bank takes the risk of an altered check, so citizens took the risk for the $86,000 check. But the drawee bank takes the risk of an unauthorized signature. Here, First American took the risk of the unauthorized signature. Nothing in Regulation J or 3418 of the UCC or Plaintiff's Negligence Voliation Claims changed that result. So turning first to the Regulation J claim, the dismissal should be affirmed for two reasons. First, First American has failed to allege any breach of the warranty. Wait, could you speak up a little louder? I'm sorry. First, First American failed to... Actually, he's much younger than I am, but I wanted you to talk up louder. I'd be happy to. So first, First American has failed to allege any breach of the Regulation J warranty. Yes, the warranty requires an adequate representation of all of the information on the front and the back of the check, but the Federal Reserve Board has confirmed what exactly that information is, and that's in the Reg CC interpretation for the Check 21 Act, and it confirms that all of the information that's required to be on the front and the back of the check is the information that's necessary to process a negotiable instrument, like the amount of the check, the payee, the drawer's signature, the preprinted information, and that other features do not need to be included, other features, such as security features, decorative items, don't need to be included on the image of the check. So here they've alleged that the microprinting didn't appear on the check and that the watermarks didn't appear on the check. Those are security features that are designed to not appear on a copy. Microprinting will not appear on a copy. Watermarks will not appear on a copy. Those are security features that are, in order for the banks to determine whether they're looking at an original or a check. So, of course, they're not going to appear on a copy of a check. So plaintiff's claims that these security features weren't on the check does not state a breach of Regulation J. And second, the district court can be affirmed because they didn't plead that the purported breach of the warranty caused them any damages, and that's where the court's questions were going to Mr. Wilson. Wait a minute. This was illegible, and you paid it anyway? How did the illegibility, and it's a counterfeit check. That's what plaintiff alleges. It was an unauthorized signature, and we paid it based on the signature that appeared on the check. Like, oh, if we had gotten, but it was fuzzy on the back. Oh, so if it was clear on the back, you wouldn't have paid it? It doesn't make any sense. They haven't alleged facts to push their claim across the line from conceivable to plausible. Yes, they claim that they wouldn't have paid an original. Well, sure, if Goodson had walked into the bank and said, give me $486,000, I would imagine that the teller would have looked at the signature card, would have checked to make sure that he was the intended payee. What amount did you say? Pardon? What amount did you say? $486,000. That's considerable sum of money. It's a large sum. So if he had done it in person, sure, they would have taken a double check at the original. Maybe they would have caught the fact that it was an unauthorized signature. But that doesn't mean that the gibberish, as he construed it, on the back of the check caused them to pay the purportedly inaccurate image. So for that reason, the breach of warranty in Reg J should be affirmed. The dismissal should be affirmed. When you say it's electronically transferred, is it a photograph? It's a photograph and an image file that's transferred through the Federal Reserve Banks, through the depository bank, to the collecting bank, to the presenting bank. But you say things that are not on the original check don't make it onto this electronic image. Right. It's like a scan of the check. Like when you make a PDF of a document, there are requirements for the detailed requirements in the Federal Reserve Board operating circulars about what exactly the quality of that scan has to be. Is it your understanding also that the originals frequently or usually destroyed? Yes, Your Honor. Is there any purpose to that? Well, generally banks have a policy to retain it for a while, and then will destroy it, for example, 60 days. And if no one's demanded the original or no one's demanded a better copy, then the stacks and stacks of originals get disposed. And here there's no allegation that First American ever asked citizens for a copy of the original check. To your question, Judge Posner, about whether you could have asked for a substitute check, the answer is no, they wouldn't have asked for a substitute check because they agreed. They have agreements with the Federal Reserve System to send and receive checks electronically. With the 21st century, everyone's going for the efficiencies of electronic processing, cuts down your time, cuts down transportation costs. That's what they're doing. So no, they've agreed to accept items electronically. They can't cry foul because they accepted an electronic item. Well, I don't understand. If the electronic item looks botched, isn't that what the substitute check provision is for? No, Your Honor. Well, what do you do if it's all botched? The Federal Reserve Board has operating circulars that say you can request the original or you can request a better copy. You don't pay it. That's not what you do. You reject the item and you request a better copy. The substitute check is for the outliers, and it's actually an interesting story. After September 11th, when the planes were grounded, all of the check collection system froze in the United States because in the olden days, you had to fly your check from New York to San Francisco to get deposited when banks insisted on physical checks. But it worked. It worked, but it wasn't fast enough for Congress, and it wasn't fast enough for the Federal Reserve Board. I don't think we're making much progress in the banking business or maybe even in the law business. Yeah, sometimes speed might not be a good thing, but that decision has been made. So what Congress did was say, if you pay your bank, refuse to accept an electronic item, we're going to kind of make you because we're going to say that a substitute check, which is a piece of paper that contains an electronic copy, is the legal equivalent of an original check. Therefore, you must accept a substitute check. Okay, fine. You don't want to, and you're worried about you don't have the original. You can have an indemnity. If you suffer a loss because you got a substitute check instead of the original check, you can have an indemnity. Now, Regulation J does not have that indemnity because both the First American and citizens and most banks have agreements with the Federal Reserve System to send and receive checks electronically. So you can't complain that you got the electronic image instead of the original. You have to prove a breach of warranty. You have to say that there was a breach of a Regulation J warranty, and then that breach caused you damage, and that's where plaintiff's claim fails. There is a Regulation J indemnity, but it's only for substitute checks that are later created from electronic images. So don't allow plaintiffs to conflate the Reg CC indemnity with the Reg J warranty. The next claim, Your Honor, is the Article 31418 claim, the claim for restitution. And here, too, the dismissal was entirely appropriate because First American failed to allege any lack of good faith on behalf of the Federal Reserve Board, which they admit, so that dismissal should be affirmed, and on behalf of citizens because the only allegation that they make is that citizens, upon information and belief, failed to follow its own policies in accepting the check and wiring the funds to Japan. Now, even if First American could prove this, it doesn't establish a lack of good faith because good faith is not reasonable care. Good faith is not due care. Good faith is not ordinary care. It's the observance of reasonable standards of good faith and fair dealing, and this Court has said that that means unfairness. That's advantage-taking. So the fact that citizens deposited the check and wired the funds to Japan is not unfair to First American. They paid the check. They have a midnight deadline. They paid the check. Whether citizens wired the funds the day before they paid the check or the same day they paid the check or the day after they paid the check, how did that have any impact whatsoever on First American's decision to pay the check? It didn't. They failed to allege any unfairness or advantage-taking of citizens. And then finally, Your Honor, on the negligence foliation claim, that one can easily be dismissed because there are no facts suggesting any duty. He conceded banks routinely destroy checks. There's no duty to retain the original check. He doesn't allege that First American doesn't allege that they asked citizens to retain the check, and therefore the dismissal of this foliation claim should be dismissed as well. If the Court has no further questions. Okay. Thank you, Ms. Collado. Thank you. Ms. Williams. May it please the Court. My name is Julia Williams. I represent the defendant, David Goodson, in this case. The issue here today is whether or not the trial court correctly ruled that Mr. Goodson is not liable for this check because there's no allegation of bad faith against him, and he took the check for value. The UCC code, which is the only remaining claim against Mr. Goodson, permits a dry bank, in this case First American, who mistakenly paid an instrument to recover from the person who the instrument was paid to, but only in the circumstances that that person took that payment in bad faith or did not rely on that payment, change positions, and rely on that. Here, Mr. Goodson was hired by a client to collect on divorce proceedings, a judgment in divorce proceedings. He collected the check. He did what any attorney would do. He deposited it at his bank in his IOLTA account. The bank at the allegations... Did he do any legal work? He was hired to collect on a judgment proceeding, Your Honor, and in this case, as is the case with a lot of cases, just being hired as an attorney sometimes makes that payee pay the person, pay that judgment. They don't want to go through the legal turmoil of going back and doing a citation proceeding or whatever it is to collect that check. So the simple act of hiring Mr. Goodson could have been enough to get this person to pay. So Mr. Goodson takes the check into the bank. The bank looks at it. I understand the check is for things that arose out of the divorce decree, right? That's the allegation in the complaint is that the judgment was a divorce proceeding and that the collection, the money was for a collection under judgment and divorce proceeding. And the person who got the divorce was associated in some way with this first aid corporation? That is actually not clear from the complaint. The allegation is that... Anyway, he got a check. Anyway, he got a check from first aid. Whether, you know, they worked, the person worked there or had assets there, but that's the person that paid the judgment. But it was presented as payment for this divorce requirement. For the alleged, that's correct, Your Honor. So he takes the check. The allegations of the complaint is that he, that Citizens Bank, when he went to Citizens, they looked at it under its blue light fraud detection. He did everything that a person could do to see if this check was fraudulent. He deposited the check, and then he paid the funds out to the client, as you would when you collect a judgment. So he did everything that he could do to... How did he pay? Did he have a deposit in this other? How did he pay the, who was owed the money? The allegations of the complaint are that the funds were wired out to Japan. So he received the check, deposited it in his IOLTA account, instructed the bank to wire the funds to the client in Japan, and that's when the funds were wired out, funds disappeared. What was his fee? The allegations in the complaint don't state what his fee, the actual amount of his fee, so that isn't in the record, Your Honor. But the complaint does say that he retained some of the fees for legal services, and I can tell you... Did he do anything except, well, you say he checked the validity of a check? Did he check the validity of the check? Yeah, didn't you say he inspected something? He took it to the bank, and the bank inspected it. Obviously, Mr. Goodson is an attorney. Was that all he did? In order to determine whether the check... No, in the whole proceeding, is that, and sending the check to Japan, was that what he did? The allegations... All he was, was a middleman, a delivery boy? Well, he was working as a collection... He's a collection attorney. Basically, in this case, he was a collection attorney, where he was assisting a client in collecting funds on a judgment. He must have gotten fairly excited when the collection was $486,000. That is a large collection amount. In this case, he was to retain a fee, the allegations, he was to retain a fee in assisting with the collection of a divorce proceeding. Wow. But it wasn't one of these cases where the collection agent puts pressure on someone to acknowledge a debt. He just did these mechanical things, right? I'm sorry, I don't think... Can you repeat the question? He just did mechanical... He didn't pressure anybody to pay this. He didn't do any legal work other than he possibly tried to tell them to send it. There's no allegation in the complaint that he sent a letter. The allegation in the complaint is that... So it's sort of an accident that he was a lawyer, in the sense he was not doing legal analysis, filing legal claims. I would state it's not an accident that he was a lawyer because as a lawyer, just being a lawyer and receiving information from a lawyer, hiring a lawyer can be enough to collect on a judgment. People don't want to be involved in litigation. They don't want to go back to court. Okay, that's fine. So Mr. Goodson was caught up in this fraud, just like citizens and First American. First American is not alleged that he didn't take for value. Where is his office, by the way? His offices are in Hinsdale. On this side or that side of the county line? Do you know that? I apologize, Your Honor. I do not know. I should have known better when I saw you were on the bench this afternoon. I apologize. I do not know. I do know that it was deposited at the Charter One Bank that is doing Citizens Does Business' Charter One Bank. So for the reasons that I've stated, Mr. Goodson did not act in bad faith. He had no knowledge. There's no allegation that he had any knowledge that the check was bad. There's no allegation that he was involved in the fraudulent scheme. There's no allegation that he knew that the signature was bad. In this case, he was a patsy in this scheme, and he received this check, and it was not a good check. Your Honors, in the response to the complaint, the plaintiff also brings up Section 407 and 306 of the UCC, as to Mr. Goodson. As Ms. Collado stated in her brief, and we joined that brief, those arguments are waived because they were not presented before the trial court, but additionally, in the instance that First American is attempting to step into the shoes of First Aid, they do not have any claims against Mr. Goodson. The claims that First Aid may have against Mr. Goodson are conversion claims. In banking cases like this, a conversion claim is not an appropriate claim. The appropriate claim is to collect from your bank and then have your bank take additional action against the payee bank, the depository bank. So for those reasons, those two, 407 and 306, are not applicable in this case and should be affirmed. The dismissal for 418, 407, and 306 should all be affirmed. Thank you, Your Honor. Okay, thank you very, very much. Ms. Williams and Mr. Wilson, anything further? Thank you, Your Honor. Just a few points. With regard to Ms. Collado's point that, well, we knew that the check was suspicious and we paid it anyway. That is a causation argument. It is not an argument on the pleadings. She wants to say this obviously bit of gibberish, this obvious bit of gibberish on the back of the check, didn't cause our loss. Well, that's something she can argue to the jury, but I should have the right to put on my bankers and say that's not what happened. Imagine another warranty. What would your bankers say? Sorry? What would your bankers say? Our banker would say that we would have read the security features we're supposed to be on this check from the good image and whatever security images would have survived the copying, we would have looked to make sure that they were there. And I see my time has expired. No, you still have a minute. Go ahead. When it gets red, you can stop. Oh, I'm sorry. I bad my eyes today. Imagine another presentment warranty claim. This is nothing more than yet another warranty claim in the collection process. There are lots of others. Presentment warranties that a check does not have any alterations. Imagine an extreme example that illustrates the point. Imagine a check gets presented and it has a bunch of globs of whiteout on the payee line, and now it says payable to the order of Joe Smith. And it's obvious that there is whiteout on the check, and it's an original check. In that situation, if the payee or bank pays that check, it has a presentment warranty claim back against the depository bank. Now, maybe the globs of whiteout didn't, maybe the alteration did not cause the loss, but there's a breach of warranty claim. You state a claim for that. The other depository bank can defend by saying, you paid it. You were so negligent. You shouldn't have paid it. But this is a quintessential question of fact. Warranty claims like this always present a question of fact, and we have alleged the elements of our claim. So I respectfully request the court to reverse. Okay. Well, thank you very much, Mr. Olson and Ms. Collado and Ms. Williams. The case will be taken under advisory, and the court will be in recess. Thank you.